[No. 12014. *En Banc.* March 11, 1915.]

ORILLIA LUMBER COMPANY *et al., Appellants,* v. CHICAGO,
MILWAUKEE & PUGET SOUND RAILWAY COMPANY
*et al., Respondents.*[1]

SALES—DELIVERY—TO CARRIER—CONSIGNMENT. Where the seller
of a car of lumber took out a bill of lading, naming the purchaser as
both consignor and consignee, and delivered the car to the railroad
company, there was a delivery of the lumber to the purchaser.

SALES—RIGHTS OF PARTIES—WHEN TITLE PASSES—LACHES—BONA
FIDE PURCHASERS. Upon a sale of a car of lumber upon condition
that ninety per cent of the purchase price should be paid on de-
livery of the bill of lading, the general rule is that the title would
remain in the seller until the payment is made; but the seller is
guilty of such laches as to estop him from claiming title as against
a *bona fide* purchaser from the consignee, where the seller took out
a bill of lading naming the purchaser as both consignor and con-
signee, and delivered the car to the railroad company, and the sell-
er's agent to collect the ninety per cent took the bill of lading and
invoice to the purchaser's office, demanded payment, and left it there
to be checked up, on the promise that it would be paid for at 1 p. m.
of that day, at which time the purchaser refused to pay for the
lumber or return the bill; this, on the theory that, of two innocent
parties to suffer from the fraud of another, the loss should fall
upon the one who has enabled the third person to do the wrong
(overruling Id., 81 Wash. 611, 143 Pac. 152).

HOLCOMB, ELLIS, and CROW, JJ., dissent.

Appeal from a judgment of the superior court for King
county, Ronald, J., entered March 13, 1914, upon findings
in favor of the intervener, in an action of replevin, tried to
the court. Affirmed.

*Million & Houser* and *George Friend,* for appellants.

*Ernest B. Herald* and *Wm. A. Holzheimer,* for respondents.

ON REHEARING.

MOUNT, J.—A petition for a rehearing was granted in
this case, and a reargument was had to the whole court sitting

[1]Reported in 148 Pac. 850.

*En Banc.* The Departmental opinion will be found in 81 Wash. 611, 143 Pac. 152. The judgment of the trial court was there reversed, with directions to enter a judgment in favor of the appellant. The facts are fully stated in that opinion. It was there said:

"The single question presented by the appeal is, Did the respondent, a purchaser from the Page Lumber Company for value and without notice, acquire title? The general rule is that, where goods are sold upon condition that the price therefor shall be paid upon receipt of an invoice of the goods, the sale is for cash, and the title remains in the seller until the goods are paid for. This is true although the goods have been delivered to the consignee and sold by it to a *bona fide* purchaser without notice."

The statement of the general rule in the departmental opinion we are satisfied is too broad. It is broader than the statement of the rule in *Hirschorn v. Canney*, 98 Mass. 149, relied upon in that opinion. The rule as there stated is as follows:

"The sale and delivery of the goods by the plaintiffs to Eaton were on condition that he should send his notes in payment. As he did not perform the condition, the title did not vest in him; and it was settled in *Coggill v. Hartford & New Haven Railroad Co.*, 3 Gray 545, that in such case the vendee could convey no title as against the vendor, who had not been guilty of laches, to a *bona fide* purchaser. This doctrine has since been repeatedly affirmed."

The general rule is that if there is laches, waiver, or estoppel on the part of the seller, a subsequent *bona fide* purchaser for value acquires good title. We think this must necessarily be the rule. Otherwise a secret agreement between a purchaser and a seller would defeat the title to goods sold in the ordinary course. Of course this cannot be true. The reasonable rule is that, where the vendor knows the purchaser is offering the goods for sale and permits the vendee to sell the goods to an innocent purchaser who knows nothing of the contract between the vendor and the vendee, the innocent

purchaser will acquire good title, even though the goods are not paid for by the vendee upon the original sale. In a note to *McIver v. Williamson-Halsell-Frazier Co.*, 19 Okl. 454, 92 Pac. 170, 13 L. R. A. (N. S.) 696, the author of the note there states:

"There is much conflict and confusion among the courts of the different jurisdictions as to the respective rights of the original vendor and a subsequent *bona fide* purchaser from the vendee, and much may be said both for and against the different doctrines enunciated and applied. One line of authorities, after holding that, under these circumstances, the buyer himself has acquired no title, applies the familiar and well-established doctrine that a purchaser of personal property, other than negotiable instruments, etc., from one who has the possession thereof, but no title thereto, does not acquire a title as against the true owner; and, therefore, holds that, the buyer having no title, a subsequent purchaser from him can obtain no better title, and will not be protected in his purchase as against the true owner, provided such owner is free from laches or fraud."

Further along in the same note, upon the question of the effect of the original seller's laches, it is said:

"The doctrine that a conditional delivery of goods sold, to be paid for in cash, will not pass title, even as against a third person, unless the vendors are guilty of laches, seems to be recognized; but it is held that it is the duty of the vendors to act promptly, otherwise, if the property reaches the hands of innocent third persons, they will be without remedy as against them, as the *indicia* of title with which they clothed the vendee by giving him possession raises the presumption that the sale was absolute."

And further along in the same note it is said:

"Many cases hold that, although, as to immediate parties to a contract of sale, a delivery conditioned upon payment of the purchase price as a condition precedent to passing of title will operate to prevent the title passing until the performance of the condition, yet, as to a *bona fide* purchaser for value and without notice, the seller is held to have no recourse."

In 4 R. C. L., p. 35, § 38, it is said:

"A bill of lading is transferable by the custom of merchants so as to vest the transferee with the title of the assignor, and since the assignee can take no greater title than that which existed in the assignor, it follows, as a general rule, that a *bona fide* purchaser under a defective title cannot claim the property described in the bill of lading as against the true owner. Where, therefore, one who has no title to goods shipped transfers a bill of lading to a *bona fide* purchaser for value the title to the rightful owner is not thereby divested, and this rule is applicable to a *bona fide* assignee who has advanced money in the faith of a bill of lading which covers goods to which the consignor did not have title. A bill of lading can be transferred, however, so as to vest title or right in the transferee only by the person to whom it is issued by authority. If transferred by an unauthorized stranger, the *bona fide* transferee cannot claim any damages from the carrier for the injury he may have suffered thereby. And so pursuant to the rule, it has been held that a *bona fide* purchaser for value, takes the legal title to property covered by a bill of lading on assignment thereof, free from any adverse claims against the assignor of which such purchaser had no notice; and moreover, that a *bona fide* purchaser's title, so acquired, cannot be disturbed or divested by a misappropriation or conversion by the assignor of funds paid to him as consideration for such assignment. But in the application of the rule first above stated, if the true owner is not without fault, as where he furnishes another with *prima facie* evidence of a power of disposal, he will be bound by the latter's sale to a *bona fide* purchaser. That the rule is not without difficulty, and very strong and plausible opposition, is evident from the fact that many of the decisions hold to the reverse doctrine and declare that a *bona fide* transferee of a bill of lading who purchases from a fraudulent vendee, for value, will obtain a title to the goods paramount to that of the original vendor."

In this state this court, in the case of *First Nat. Bank of Pullman v. Northern Pac. R. Co.*, 28 Wash. 439, 68 Pac. 965, held, that where a carrier issues a bill of lading for goods delivered to it for shipment, it should demand and receive the

bill of lading before delivering the goods, in order to avoid liability. In speaking to this question we said, at page 443:

"The principle stated by Judge Cooley on Torts, page 456, that a mere bailee, whether common carrier or otherwise, is guilty of no conversion though he receive property from one not rightfully entitled to possession, and, acting as a mere carrier, delivers it in pursuance of the bailment, if this is done before notice of the rights of the real owner, is suggested as pertinent to this controversy. In the absence of statutory definition and regulation of bills of lading, the deductions made from the very numerous authorities adduced by counsel for appellant, which exonerates the carrier from liability in an ordinary contract when delivery is made to the consignee, may be conceded. Primarily a bill of lading or receipt is not necessary to constitute the contract. The delivery of commodities to the common carrier, with the designation of the person and place of shipment, is all that is requisite. Custom and the law fix the responsibility and liability of the carrier. The presumption then is that the consignee is the owner, and, without notice to the contrary, the carrier may safely make delivery to him. It seems from an examination of a large number of cases involving the nature of bills of lading made by a common carrier that the custom very generally exists of shippers selling or assigning such bills of lading and receiving payment therefor and advances upon the same. The custom enables the shipper to receive immediate payment from his local bank. The usage materially aids and stimulates trade and commercial transactions. It enables the small shipper or producer to realize upon agricultural products, such as wheat, at the most favorable market prices."

The goods in this case were delivered by the Orillia Lumber Company to the railway company. The Page Lumber Company was named in the bill of lading as the consignee. The Page Lumber Company was also named as the consignor. If the goods had been lost in transit, it is plain that the railway company would have been liable to the Page Lumber Company therefor, because the loading of the lumber in the car and taking the bill of lading in the name of the purchaser constituted a delivery to the purchaser. *Whitman Agricul-*

*tural Co. v. Strand,* 8 Wash. 647, 36 Pac. 682; *Roy v. Griffin,* 26 Wash. 106, 66 Pac. 120; *Izett v. Stetson & Post Mill Co.,* 22 Wash. 300, 60 Pac. 1128; *Knox v. Fuller,* 23 Wash. 34, 62 Pac. 131.

While there is conflict among the authorities upon the question, we think the great weight of authority is to the effect that, where goods are sold upon condition that the price therefor shall be paid upon receipt of the invoice of the goods, the title remains in the seller until the goods are paid for, unless the original vendor is guilty of laches, or by some act has waived his right, or is estopped from claiming that the sale is one for cash. In the case of *Wigton v. Bowley,* 130 Mass. 252, it was said:

"In the sale of specific chattels, an unconditional delivery to the buyer or his agent, or to a common carrier consigned to him, whether a bill of lading is taken or not, is sufficient to pass the title, if there is nothing to control the effect of it. If the bill of lading or written evidence of the delivery to a carrier be taken in the name of the consignee, or be transferred to him by indorsement, the strongest proof is afforded of the intention to transfer the property to the vendee. *Merchants National Bank v. Bangs,* 102 Mass. 291. If the vendor intends to retain the right to dispose of the goods while they are in course of transportation, he must manifest that intention at the time of their delivery to the carrier. It is not the secret purpose, but the intention as disclosed by the vendor's acts and declarations at the time, which governs."

That was said in a case where a carload of flour was ordered at an agreed price to be delivered on board the cars, and the vendor was authorized to draw upon the vendee for the amount at ten days' sight. When the flour was shipped, a receipt was taken in the name of the vendee, who was also named as the consignee. A draft was sent for collection, with directions to deliver the receipt to the vendee upon his accepting the draft. The draft was not accepted and was returned to the vendor. It was there held, in an action by the vendor for the conversion of the flour against a person who had purchased from the vendee in good faith and who had obtained

possession of it, that the title to the property had passed to the vendee when it was delivered to the railroad company for transportation.

In *Michigan Central R. Co. v. Phillips*, 60 Ill. 190, there was a contract which provided for cash on delivery. The seller took the goods to the buyer's premises, but there was no one there to pay. The seller left the goods with some one in charge of the buyer's premises, and stated that he would call in the morning and get his pay. Before he called the next morning the buyer shipped the goods and obtained a bill of lading which he disposed of to an innocent purchaser. The court there said:

"The property here, where nothing remained to be done to complete the sale, either to identify the property or ascertain the price, was entrusted to the possession of the purchaser by the consent of the owner, under the form of a regular sale and delivery, and in the completion of the same; and by its being thus placed under his control, Ames was enabled to obtain credit by pledging it to an innocent party.

"The sellers did not see fit to exact payment at the time, as they might and should have done, where rights of innocent purchasers might intervene, but trusted to the personal security of Ames till the following morning; and the consequence of this misplaced confidence should be borne by them rather than that the bank should be the sufferer by it. It is an instance for the application of the familiar rule, founded on sound reason, that where one of two innocent persons must suffer from the fraud of a third, the loss should fall on him who, by his imprudence, enabled such third person to commit the fraud."

In *Hall v. Hinks*, 21 Md. 406, the court said:

"This rule rests upon the well established principle of equity, 'that when one of two innocent persons must suffer by the fraud of a third, the loss shall fall upon him, who has enabled such third person to do the wrong.' "

In that case the Maryland court further said:

"An examination of the authorities, and a careful consideration of the subject, have led us to the conclusion that the

same rule applies; and that a *bona fide* purchaser, without notice of the condition upon which his vendor has acquired the possession, will be protected against the claim of the original vendor, in the same manner where the sale and delivery are conditional, as where the possession has been obtained by fraud. It seems to us, the same equitable principle lies at the foundation of the rule, and is equally applicable to both classes of cases.

"If a party purchase goods for cash, and they are delivered to him upon the condition that he shall pay for them on delivery, he perpetrates a fraud by selling them to another before complying with the condition; but if the person to whom he sells deals with him in good faith, ignorant of the secret defect in his title, and pays value, it is difficult to see why, upon the principle before stated, the innocent purchaser ought not to be protected against the claim of the original vendor, who, by his own act, has enabled his vendee to perpetrate the fraud."

In the case of *National Bank of Bristol v. B. & O. R. Co.*, 99 Md. 661, 59 Atl. 134, 105 Am. St. 321, it appears that Atkins Brothers sold to DeCamp a car of lumber. A bill of lading was issued in which DeCamp was named both as consignor and consignee. In payment for the lumber, DeCamp gave to Atkins Brothers a check which was dishonored. DeCamp assigned the bill of lading to the plaintiff bank. When the check was dishonored, Atkins Brothers gave a bond to the defendant railway company and recovered the lumber. The bank then sued the railway company. It was there held that the plaintiff was entitled to recover as it was in the position of an innocent purchaser, having bought on the strength of a bill of lading. After discussing at length the effect of the transfer of a nonnegotiable bill of lading, the court said, at page 680:

"The more modern rule upon the subject under consideration seems to be, that where the owner of things in action, although not technically negotiable, has clothed another to whom they are delivered in the method common to all mercantile communities with the usual apparent *indicia* of title, he will be estopped from setting up against a second assignee

to whom the securities have been transferred for value and without notice, that the title of the first assignee was not perfect and absolute.

"We have said that the bank acquired by the assignment of the bill of lading precisely the title that DeCamp had to the lumber on the day the transfer was made. But it is insisted that DeCamp obtained possession of the lumber by fraud and therefore that he got no title to it at all and consequently could give none to the bank. If it be conceded that he did secure the lumber by fraud, still if the bank was ignorant of the fraud and took the bill of lading in good faith and for value it acquired an unassailable title, even as against the defrauded vendor. That proposition has been distinctly settled in *Hall v. Hinks et al.*, 21 Md. 417. . . . If the jury should believe that the bank acted in good faith in discounting the draft for DeCamp and accepting the bill of lading as collateral security, and if Atkins Brothers, by putting it in the power of DeCamp to deal with the property as his own enabled him to mislead the bank, and if in consequence of their confidence in him and the credit of one day which they gave him a loss must fall either upon the bank or upon them, then, wholly aside from all questions respecting the negotiability of the bill of lading, the doctrine imposes the loss upon the persons by whose carelessness DeCamp·was enabled to represent to the bank that the property was his, that loss thus occasioned by that representation, must fall upon them."

Many other cases might be cited and quoted from to the same effect. The general and equitable rule is that when one of two innocent persons must suffer, that one must suffer who has placed it in the power of a third person to do the wrong. In this case, as we have seen above, it is conceded that the Orillia Lumber Company loaded the lumber upon the car of the railway company and a bill of lading was issued at its request to the Page Lumber Company. Therefore, so far as any person dealing with the bill of lading was concerned or could have known, the Page Lumber Company was both the consignor and the consignee of the lumber. In short, the lumber was delivered to the Page Lumber Company at the time it was loaded upon the car. There was nothing upon the bill

of lading to indicate that the Orillia Lumber Company had any interest in the lumber. Any person purchasing the lumber upon the authority of the bill of lading would not have known that the Orillia Lumber Company had any interest in the lumber whatsoever. It seems plain, therefore, that this was such laches as would estop the Orillia Lumber Company from obtaining the lumber from an innocent purchaser for value and in good faith. In *Security State Bank v. O'Connell Lumber Co.*, 64 Wash. 506, 117 Pac. 271, we said:

"When property designed for sale is loaded onto a car by a vendor, and he takes the bill of lading in his own name, a sale or delivery will not be presumed; for the bill of lading becomes a symbol of property or, as Mr. Benjamin calls it, 'a document of title,' and the title will not ordinarily pass until the bill of lading is surrendered."

In *Bonds-Foster Lumber Co. v. Northern Pac. R. Co.*, 53 Wash. 302, 101 Pac. 877, it was said:

"It is true that the books speak of the bill of lading as a symbol of the property, and statements are found to the effect that a delivery of the bill of lading is a symbolic delivery of the property, and a transfer of such property to the holder of such bill of lading. We apprehend that the true meaning of this language is that such delivery by the consignor only operates as a transfer of property or some interest in it when there is a stipulation in the bill itself whereby an ownership is retained in the consignor. It would certainly involve an absurdity to say that, where the goods are consigned to a named consignee, title passes to such consignee, and at the same time to announce that an indorsement or delivery of such bill to a third party by the consignor passes an interest in the property. It is only a symbol of the property where the consignor upon the face of the bill reserves an interest."

In this case, if the Orillia Lumber Company desired to reserve any interest in the property shipped, it could easily have done so by having the bill of lading made out in its name, or a note or memorandum made upon the bill of lading stating the terms of sale. Instead of this, the consignor billed

the lumber in the name of the consignee, so that the bill of lading showed upon its face that the lumber was shipped by the consignee to itself. This bill of lading was left in the possession of the Page Lumber Company, the bearer no doubt trusting upon the security of that company. It was by the use of this bill of lading that the Page Lumber Company was permitted to perpetrate the fraud, if there was fraud. It seems plain under these facts that the innocent purchaser for value should not suffer the loss, but that the loss should fall on the one who by imprudence made the fraud possible.

It is true this court held in *Rumpf v. Barto*, 10 Wash. 382, 38 Pac. 1129, that where goods were delivered to a person under an agreement that the goods were sent merely for inspection, and to be returned upon demand, where the goods were sold, the owner of the goods might recover them. But in that case it was said that neither party was in any way in fault; and in such a case the legal owner was entitled to the possession. The facts in that case are not controlling here, because the goods involved in that case were in effect stolen, and the rule of stolen goods was applied.

We conclude that the judgment of the trial court was right, and it is therefore affirmed.

MORRIS, C. J., PARKER, and FULLERTON, JJ., concur.

MAIN and CHADWICK, JJ. (concurring)—We concurred in the original opinion in this case, but upon a reargument, and a fuller consideration of the authorities, we have become convinced that the right result was not there reached. Upon the first hearing, too little consideration was given to the fact that the lumber had been delivered to the carrier and the bill of lading taken in the name of the Page Lumber Company as both consignor and consignee; and the legal effect of the situation thus presented when the rights of a purchaser from the Page Lumber Company, for value and without notice, are involved. Had the bill of lading been taken in the name of the Orillia Lumber Company, and by that company indorsed

in blank, a different situation would be presented, and the views expressed in the original opinion would be apposite. We therefore concur in the opinion expressed by Judge Mount.

HOLCOMB, J. (dissenting)—I dissent.  The opinion of Judge Gose upon the original hearing (81 Wash. 611, 143 Pac. 152), is invincible.  It states the law correctly, applies the same accurately to the facts in this case, and decides the case justly.  No principles of law or justice are subverted or disregarded therein.

Too much importance is attached by the majority of the court in the present decision to the weight and effect of a bill of lading.  The proposition is simple.  A common carrier is bound to receive for carriage goods delivered to it by any one, whether owner or thief, for carriage to a given destination.  It issues to the shipper a bill of lading which has two aspects: First, it is a receipt for the goods to the shipper; and second, it is a contract to carry said goods to the destination and deliver the same to a named consignee.  The bill of lading constitutes a symbol of possession of the goods, but not a muniment of title, nor does the statute make it so.  If it were so, then a thief could divest the real owner of title and pass a lawful title to portable goods by merely stealing the goods, delivering them to a common carrier, and obtaining its bill of lading therefor to a named consignee other than the true owner.  So the present majority opinion gives to one who obtains no title to or right of possession of personal property, but merely obtains possession of the paper symbol or substitute therefor without authority, the power to pass valid title to the property by merely transferring the paper substitute to another.  No such thing was ever known in the law.  If that can be done, then as was said in *Hirschorn v. Canney*, 98 Mass. 149: One who obtains possession "of a horse to go on a journey can make a valid sale of the horse. If he has no title, *how can he communicate one?*"

The proposition is advanced that appellant was guilty of laches, and that in such case the rule applies that "when one of two innocent persons must suffer by the fraud of a third, the loss shall fall upon him who has enabled such third person to do the wrong." How can it be said that appellant was guilty of laches? What more could it have done? In the first place, as stated by Judge Gose, it "did the usual thing— presented the bill of lading and invoice for payment; and the bill of lading was retained against its protest, and payment refused." "There was not only no intention to deliver the bill of lading, but there was no delivery." Neither was there any delivery of the thing itself, the lumber. Immediately after the Page Lumber Company had refused to pay the ninety per cent of the invoice price and refused to return the bill of lading, appellant unloaded the lumber from the car. The railroad company, against the protest of appellant, reloaded the lumber and moved the car to Seattle. The appellant followed it up, replevined it, and sold it. What more could have been done by appellant to protect its rights? The lumber itself, the real *res*, never did get into possession of the vendee or its innocent purchaser. All that either of them ever had was the paper substitute. On the same theory, it would be the imprudence of an owner of a horse, borrowed by a dishonest person to go upon a journey and sold by the dishonest one instead of being returned, which would be at fault by loaning the horse and putting it into the possession of the borrower. On the same theory, the "stolen goods" doctrine, mentioned in the majority opinion, would in most cases fail of its effect, for it would be found that the imprudence of the owner in putting the goods where they could be stolen gave an innocent purchaser from the thief title to the property. In fact, the reasoning of the majority refutes itself upon every point.

The law has most carefully protected the ownership of personal property, other than money, against misappropriation by others than the owner, even when it is out of his

possession.    4 Ruling Case Law, § 39; *Shaw v. Railroad Co.*, 101 U. S. 557.   And the same rule applies in a case where the bill of lading was procured by the fraud of the assignor. *Decan v. Shipper*, 35 Pa. St. 239, 78 Am. Dec. 334.

The judgment should be reversed as before.

ELLIS and CROW, JJ., concur with HOLCOMB, J.