[No. 3951.   Decided April 25, 1902.]

FIRST NATIONAL BANK OF PULLMAN, *Respondent*, *v.*

NORTHERN PACIFIC RAILWAY COMPANY, *Appellant.*

28   439
e30   476
28   439
39   514
28   439
e42   576

CARRIERS — DELIVERY OF GOODS — PRODUCTION OF BILL OF LADING REQUISITE.

Under both commercial usage and the statute of this state, where a carrier issues a bill of lading for goods delivered to it for shipment, it should demand and receive the bill of lading before delivery in order to avoid liability; and even its delivery of the goods to a consignee designated in the bill of lading will not exonerate it from liability unless such delivery be made upon the production of the bill of lading.

SAME — INDORSEMENT OF BILL OF LADING.

Under Bal. Code, § 3600, which provides that "when a bill of lading or warehouse receipt is made to 'bearer,' or in equivalent terms, a simple transfer thereof by delivery conveys the same title as an indorsement," the power of indorsement is not restricted to the consignee, but the carrier who has delivered such a bill of lading to the shipper is conclusively charged with knowledge of the fact, and of its negotiability both by custom and statute.

Appeal from Superior Court, Whitman County.—Hon. WILLIAM McDONALD, Judge.   Affirmed.

*Stephens & Bunn,* for appellant.

*W. J. Bryant* and *H. W. Canfield,* for respondent.

The opinion of the court was delivered by

REAVIS, C. J.—Action by respondent, a bank, to recover the value of two consignments of wheat carried by the appellant railway company from Whelan to Spokane. The wheat was shipped by Chambers, the owner. The railway company delivered to Chambers two bills of lading exactly alike except in the quantity of wheat described therein, one of which is as follows:

"Copy 50 M.

NORTHERN PACIFIC RAILWAY COMPANY.

S. & P. Division.

"No. Car, 10230 N. P.     Whelan, Wash., Aug. 25, 1898.

"Received from W. M. Chambers, in apparent good condition.

| "Consignee and Destination. | Description of Property. | Weight |
|---|---|---|
| "Centennial Mill Co. | 360 sax wht. | 47,520 |
| "Spokane, Wash. | | |

"As described above, contents and value unknown, to be transported by the Northern Pacific Railway to station Spokane, ready to be delivered to the parties entitled to the same, and it is expressly stipulated and agreed that the above property is transported on the conditions indorsed hereon, which form part of this contract, and of the consideration for carrying the same, and not otherwise.

NORTHERN PACIFIC RAILWAY,

"No. 3.                    By. J. S. Keeney, Agent."

The case was tried by the court without the intervention of a jury. The railway company, defendant, carrier, set up some matters affirmatively in defense. This portion of the answer was stricken before trial, and error is assigned upon such ruling of the court. But, as this defense went to the construction and effect of the bills of lading, the error will be considered in the determination of the merits on the facts as found. These are that Chambers was the owner of the wheat, and consigned the same to the Centennial Mill Company at Spokane, and that no other names appeared in the bill of lading than "Chambers" and "Centennial Mill Company"; that Chambers, upon the shipment, sold, assigned, transferred, and set over the bills of lading to the bank by indorsing his name on the back thereof, for the actual consideration of the purchase price of the wheat, which was paid in cash to Chambers, and which Chambers used to pay for the pur-

chase of the wheat, and that plaintiff is the owner of the bills of lading and entitled to the delivery of the wheat; that defendant carried the wheat to Spokane, and, without any order or authority of plaintiff or Chambers, and without demanding or receiving a surrender of the bills of lading, wrongfully delivered the same to the Centennial Mill Company; that before the commencement of the action plaintiff demanded of defendant the delivery of the wheat, which delivery was refused. It was further found that in the spring of 1898, Chambers, Price & Co., doing business at Pullman, contracted to ship to the Centennial Mill Company a certain number of bushels of No. 1 wheat; that the wheat when shipped, was subject to inspection at the terminal by the mill company, and was also subject either to rejection or dockage in weights and grades; that Chambers, Price & Co., pursuant to the contract had shipped a sufficient number of bushels of grain to fill their contract with the mill company, but by reason of dockage and discount for claimed shortage in weights and deficiencies in quality, the mill company claimed a balance due in money in the sum of $665.58; that thereafter, in July, 1898, Chambers, who was a former partner of the firm of Chambers, Price & Co., the said firm having become insolvent, and having been theretofore dissolved, agreed with the mill company to carry out the firm contract of Chambers, Price & Co., and himself shipped the amount of grain necessary to fill the amount agreed to be delivered to the mill company at Spokane, and it was then agreed between Chambers and the mill company that he should draw against said shipments fifty to fifty-five cents per bushel in money to cover the purchase price of said grain, and no more; that Chambers and the Centennial Mill Company had, during a term of years, and it was the fixed and established custom between

them, for Chambers as shipper and vendor, to draw drafts through a banking house for the price of the commodities so shipped, and to attach the bills of lading thereto, and at the time of the transaction in controversy Chambers had no notice of any repudiation thereof, or of any change on the part of the Centennial Mill Company, in said settled course of business between them; that plaintiff, upon the receipt of the bills of lading and a draft upon the Centennial Mill Company for the price of the wheat, forwarded such bills of lading with the draft attached, for collection from the mill company; but the mill company refused to receive the bills of lading or pay the draft, and they were returned to plaintiff; that at the time of the delivery of the wheat to the mill company it knew that plaintiff held the draft and bills of lading. The court concluded that the refusal of defendant to deliver the wheat to plaintiff on presentation of the bills of lading was conversion, and found the value of the wheat, and gave judgment in favor of plaintiff against the defendant for such amount.

1.   The principal controversy between counsel is the function and construction of the bills of lading.   It is urged by counsel for appellant that, if there be no reservation by the shipper the title presumptively rests in the consignee, and a number of authorities are cited to support the view that in an ordinary shipment of commodities the duty of the carrier is to deliver to the consignee; that the consignee is presumptively the party to recover for breach of the contract of carriage.   As illustrative of and supporting the view, among others, the following authorities are mentioned:   2 Daniel, Negotiable Instruments (4th ed.), §§ 1743, 1744; 4 Elliott, Railroads, § 1426; *Pennsylvania Co. v. Poor,* 103 Ind. 553 (3 N. E. 253); *The Sally Magee,* 3 Wall. 451; Benjamin, Sales

(6th ed.), 332; *Whitman Agricultural College v. Strand*, 8 Wash. 647 (36 Pac. 682); *Pacific Lounge, etc., Co. v. Rudebeck*, 15 Wash. 336 (46 Pac. 392); *Izett v. Stetson & Post Mill Co.*, 22 Wash. 300 (60 Pac. 1128).

Authorities are also cited which well support the contention that, where the carrier is ignorant of the fact that the consignor was the owner of the property, and the consignment is an absolute one, he has a right to assume that the consignee is the owner, and to settle a claim for loss with him. See *Scammon v. Wells, Fargo & Co.*, 42 Am. & Eng. Railroad Cases, 400 (84 Cal. 311, 24 Pac. 284).

But it is also urged that, where the consignor drew a sight draft on the consignee, and attached it to the bill of lading, and forwarded them to a third party for collection, and the company had no notice from the consignor to retain ownership and control of the shipment, and the company delivered it to the consignee without requiring production of the bill, the company was justified in presuming that the consignee was the owner, and that the company was discharged by the delivery to the consignee at the destination specified in the bill of lading. See *Forbes v. Boston & Lowell R. R. Co.*, 9 Am. & Eng. Railroad Cases, 76 (133 Mass. 154).

The principle stated by Judge Cooley on Torts, page 456, that a mere bailee, whether common carrier or otherwise, is guilty of no conversion though he receive property from one not rightfully entitled to possession, and, acting as a mere carrier, delivers it in pursuance of the bailment, if this is done before notice of the rights of the real owner, is suggested as pertinent to this controversy. In the absence of statutory definition and regulation of bills of lading, the deductions made from the very numerous authorities adduced by counsel for appellant, which exonerate the carrier from liability in an ordinary contract

when delivery is made to the consignee, may be conceded. Primarily a bill of lading or receipt is not necessary to constitute the contract. The delivery of commodities to the common carrier, with the designation of the person and place of shipment, is all that is requisite. Custom and the law fix the responsibility and liability of the carrier. The presumption then is that the consignee is the owner, and, without notice to the contrary, the carrier may safely make delivery to him. It seems from an examination of a large number of cases involving the nature of bills of lading made by a common carrier that the custom very generally exists of shippers selling or assigning such bills of lading and receiving payment therefor and advances upon the same. This custom enables the shipper to receive immediate payment from his local bank. The usage materially aids and stimulates trade and commercial transactions. It enables the small shipper or producer to realize upon agricultural products, such as wheat, at the most favorable market prices. In the case of *Ratzer v. Burlington, C. R. & N. Ry. Co.,* 64 Minn. 245 (66 N. W. 988, 58 Am. St. Rep. 530), where a delivery was made without demanding the bill of lading, the court observed:

"We are of the opinion that, on the facts found, the plaintiff is entitled to judgment. A vast portion of the produce of this country is moved from the agricultural districts to the commercial centers and the seaboards by the aid of advances made on the security of such bills of lading. A well-established custom has grown up in commercial circles by which such bills of lading are treated as the symbols of title to the property in transit, are taken as security for money advanced, and indorsed and delivered as a transfer of the property. This is well understood by the railroad companies and every one else. To allow the railroad companies to ignore this custom

would be to destroy the custom itself. This would cause great hardship, revolutionize business methods, and drive all buyers and shippers of small means out of the business, as they could no longer give ready and available security on commodities in transit and thereby turn their limited capital sufficiently quickly and often to enable them to do much business. This, in turn, would destroy competition, and leave the business in the hands of a few concerns with unlimited capital. Neither have the railroad companies any right to ignore this custom. On the contrary, it must be held that these companies have been doing business with reference to this custom as much as the shippers themselves and the consignees, banks, commission merchants, and others who are continually advancing money on the faith of the security of these bills of lading."

And similar views are expressed in *Wichita Savings Bank v. Atchison, T. & S. F. R. R. Co.,* 20 Kan. 519. In the latter case, as in many others, the discussion of the nature of bills of lading under commercial usage and custom is without reference to statutory definitions and regulations. *Union Stock-Yards Co. v. Westcott,* 47 Neb. 300 (66 N. W. 419); *Walters v. Western & A. R. R. Co.,* 63 Fed. 391; *Gates v. Chicago, B. & Q. R. R. Co.,* 42 Neb. 379 (60 N. W. 583); *Furman v. Union Pacific R. R. Co.,* 106 N. Y. 579 (13 N. E. 587); *Garden Grove Bank v. Humeston & S. Ry. Co.,* 67 Iowa, 526 (25 N. W. 761). By virtue of the statute in New York, the carrier must demand and receive the bill of lading before delivery in order to avoid liability. *Colgate v. Pennsylvania Co.,* 102 N. Y. 120 (6 N. E. 114).

Thus, the better reasoning and the weight of authority seem, by the force of general commercial usage, to require that the delivery of commodities be made upon the production of the bill of lading, if one be issued by the carrier. Hutchinson on Carriers (2d ed.), § 130b, observes:

"The carrier, being thus bound to deliver the goods in accordance with the bill of lading, is, it is said, under obligation to ascertain whether or not a bill of lading was delivered to the shipper, and, if delivered, he must retain the property until it is demanded by one claiming under that title."

2. An examination of our statutes seems to fairly determine the controversy. Section 3598, Bal. Code, declares the effect of bills of lading and transportation receipts as follows:

"All checks or receipts given by any person operating any warehouse, commission house, forwarding house, mill, wharf, or other place of storage, for any grain, flour, pork, beef, wool, or other produce or commodity, stored or deposited, and all bills of lading, and transportation receipts of every kind, are hereby declared negotiable, and may be transferred by indorsement of the party to whose order such check or receipt was given or issued, and such indorsement shall be deemed a valid transfer of the commodity represented by such receipt, and may be made either in blank or to the order of another."

And § 3603 declares when the carrier may be exonerated, as follows:

"A carrier or warehouse proprietor is exonerated from liability for freight by delivery thereof, in good faith, to any holder of an original bill of lading or warehouse receipt thereof, properly indorsed, or made in favor of the bearer."

There is also a further pertinent provision in § 3604:

"When a carrier or warehouse proprietor has given a bill of lading, warehouse receipt, or other instrument substantially equivalent thereto, he may require its surrender, or a reasonable indemnity against claims thereon, before delivering the freight."

Suggestion is made by counsel that the indorsement of the bill of lading can only be made by the consignee, but it may be observed that § 3600, Bal. Code, specifies:

"When a bill of lading or warehouse receipt is made to 'bearer' or in equivalent terms, a simple transfer thereof by delivery conveys the same title as an indorsement."

The bills of lading under consideration here were delivered by the carrier to the shipper. Surely, the defendant is conclusively charged with knowledge that the bills were given to Chambers, and the knowledge of their negotiability, both by custom and the statute must likewise be imputed to it.

It follows that the judgment is correct and it is affirmed.

WHITE, HADLEY, FULLERTON, ANDERS, DUNBAR and MOUNT, JJ., concur.